IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| DOMONICA G.,<br><br>　　　　　　Plaintiff,<br><br>vs.<br><br>KILOLO KIJAKAZI, Commissioner<br>of Social Security,<br><br>　　　　　　　　Defendant. | CV 20-178-BLG-KLD<br><br><br>ORDER |

Plaintiff brings this action under 42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social Security denying her application for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 et seq., 1381 et seq.

## I.   **Procedural Background**

Plaintiff protectively filed applications for Title II disability insurance benefits and Title XVI supplemental security income in March 2018, alleging disability since November 10, 2017 based on physical and mental impairments. (Doc. 11 at 246-255). Plaintiff's claim was denied initially and on reconsideration, and by an ALJ after an administrative hearing. (Doc. 11 at 15-47; 122-123; 170-

71). The appeals council denied Plaintiff's request for review, thereby making the ALJ's decision dated June 26, 2020, the agency's final decision for purposes of judicial review. Jurisdiction vests with this Court pursuant to 42 U.S.C. § 405(g).

## II.  Legal Standards

### A.  Standard of Review

42 U.S.C. § 405(g) provides a limited waiver of sovereign immunity, allowing for judicial review of social security benefit determinations after a final decision of the Commissioner made after a hearing. See *Treichler v. Commissioner of Social Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014). A court may set aside the Commissioner's decision "only if it is not supported by substantial evidence or is based on legal error." *Treichler*, 775 F.3d at 1098 (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Widmark v. Barnhart,* 454 F.3d 1063, 1070 (9th Cir. 2006). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). "Where evidence is susceptible for more than one rational interpretation," the court must uphold the ALJ's decision. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that 'the ALJ's error was

inconsequential to the ultimate nondisability determination.'" *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006)).

**B.    Disability Determination**

To qualify for disability benefits under the Social Security Act, a claimant bears the burden of proving that (1) he suffers from a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of twelve months or more; and (2) the impairment renders the claimant incapable of performing past relevant work or any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A). See also *Batson v. Commissioner of Soc. Sec. Admin.*, 359 F.3d 1190, 1193-94 (9th Cir. 2004).

In determining whether a claimant is disabled, the Commissioner follows a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520 and 416.920. If a claimant is found to be "disabled" or "not disabled" at any step, the ALJ need not proceed further. *Ukolov v. Barnhart*, 420 F.3d 1002, 1003 (9th Cir. 2005). The claimant bears the burden of establishing disability at steps one through four of this process. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

At step one, the ALJ considers whether the claimant is engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i) and 416.920(a)(4)(i). If so, then the claimant is not disabled within the meaning of the Social Security Act.

At step two, the ALJ must determine whether the claimant has any impairments, singly or in combination, that qualify as severe under the regulations. 20 C.F.R. §§ 404.1520(a)(4)(ii) and 416.920(a)(4)(ii). If the ALJ finds that the claimant does have one or more severe impairments, the ALJ will proceed to step three.

At step three the ALJ compares the claimant's impairments to the impairments listed in the regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii). If the ALJ finds at step three that the claimant's impairments meet or equal the criteria of a listed impairment, then the claimant is considered disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii).

If the ALJ proceeds beyond step three, she must assess the claimant's residual functional capacity. The claimant's residual functional capacity is an assessment of the work-related physical and mental activities the claimant can still do on a regular and continuing basis despite his limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a); Social Security Ruling (SSR) 96-8p. The assessment of a claimant's residual functional capacity is a critical part of steps four and five of the sequential evaluation processes.

At step four, the ALJ considers whether the claimant retains the residual functional capacity to perform his past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv) and 416.920(a)(4)(iv). If the claimant establishes an inability to engage in past work, the burden shifts to the Commissioner at step five to establish that the claimant can perform other work that exists in significant numbers in the national economy, taking into consideration claimant's residual functional capacity, age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(v) and 416.920(4)(v). The ALJ may satisfy this burden through the testimony of a vocational expert or by referring to the Medical-Vocational Guidelines set forth in the regulations at 20 C.F.R. part 404, subpart P, appendix 2. If the ALJ meets this burden, the claimant is not disabled.

## III.   <u>Discussion</u>

The ALJ followed the five-step sequential process in evaluating Plaintiff's claim. At step one, the ALJ found Plaintiff meets the insured status requirements of the Social Security Act through June 30, 2022. The ALJ further found that Plaintiff had not engaged in substantial gainful activity since the November 10, 2017 alleged onset date. (Doc. 11 at 26). At step two, the ALJ found that Plaintiff had the following severe impairments: cervical degenerative disc disease; bilateral upper extremity cubital tunnel syndrome/ulnar neuropathy; Raynaud's; emphysema; depression; anxiety; and posttraumatic stress disorder (PTSD). (Doc.

11 at 26). At step three, the ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled any impairment described in the Listing of Impairments, 20 C.F.R. §§ 404.1520(d), 416.920(d); 20 C.F.R. pt. 404, subpt. P, app. 1. (Doc. 11 at 27).

The ALJ then found that Plaintiff had the residual functional capacity to perform a range of light work as follows:

> [T]he claimant is able to lift, carry, push, and pull 10 pounds frequently and 20 pounds occasionally, is able to stand and/or walk about six hours in an eight-hour workday, and is able to sit for about six hours in an eight-hour workday. The claimant is frequently able to handle and finger bilaterally and must avoid even moderate exposure to extreme cold and to fumes, odors, dusts, gases, and poor ventilation. The claimant is able to understand, remember, and carry out simple tasks, and is able to maintain attention, concentration, persistence, and pace for such tasks for eight-hour workdays and 40-hour workweeks. The claimant is able to tolerate interaction with supervisors, coworkers, and members of public, is able to tolerate usual work situations, and is able to tolerate changes in routine work settings.

(Doc. 11 at 35). At step four, the ALJ determined that Plaintiff was capable of performing past relevant work as a cashier. (Doc. 11 at 43). The ALJ made alternative findings at step five, concluding there were other jobs existing in significant numbers in the national economy that Plaintiff could perform, including garment sorter, bench assembler, and machine feeder.  (Doc. 11 at 45).

Plaintiff argues the ALJ's decision is not supported by substantial evidence, and raises two main issues on appeal. Plaintiff does not challenge the ALJ's evaluation of the medical opinion evidence as it relates to her mental impairments.

Focusing instead on her physical impairments, Plaintiff first argues the ALJ improperly assessed and rejected the opinion of her primary care provider, physician assistant Rebecca Hintze, PA-C. Second, Plaintiff maintains the ALJ did not provide clear and convincing reasons for discounting her subjective testimony.

A.      **Subjective Symptom Testimony**

Plaintiff argues the ALJ failed to provide clear and convincing reasons for discounting her subjective testimony as to the severity of her symptoms and limitations.

The ALJ must follow a two-step process when evaluating a claimant's subjective symptom testimony. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007). At step one, "the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter*, 504 F.3d at 1036. If the claimant meets this initial burden, at step two the ALJ may discredit the claimant's subjective symptom testimony about the severity of her symptoms "only by offering specific, clear and convincing reasons for doing so." *Lingenfelter*, 504 F.3d at 1036.

Here, the ALJ found Plaintiff met her initial burden because she produced evidence of medically determinable impairments that could reasonably be expected to cause her alleged symptoms. The ALJ then found that Plaintiff's statements

concerning the intensity, persistence and limiting effects of her symptoms were not entirely consistent with the medical and other evidence in the record. (Doc. 11 at 32).

At her administrative hearing, Plaintiff testified that she would not be able to work full-time because she is in pain 24-hours a day, 7 days a week, and is unable to stand for any length of time and cannot lift anything. (Doc. 11 at 66). She described cramping in her hands and feet, and chronic neck and back pain. Plaintiff estimated that she is able to stand for 30 minutes at a time, and sit for 30 minutes at a time. (Doc. 11 at 67). Plaintiff testified that she is able to write for five to ten minutes at a time, but has such difficulty gripping that she frequently drops objects such as cups, soda bottles, and gallon milk jugs. (Doc. 11 at 67-68). Plaintiff further testified that she is unable to reach overhead, and has debilitating migraines two to three times a month that last for 24 to 48 hours. (Doc. 11 at 69-70). Plaintiff also described suffering from fatigue, and testified that she spends two to three hours a day lying down and napping. (Doc. 11 at 69-70). Plaintiff stated that she has panic attacks at least once a week, that are caused by crowds like those encountered while grocery shopping. (Doc. 11 at 73).

The ALJ summarized Plaintiff's subjective testimony (Doc. 11 at 31), but discredited her statements as to the severity of her symptoms and limitations for a number of reasons. First, the ALJ found that Plaintiff's "broad and varied" daily

activities were not consistent with her alleged limitations. (Doc. 11 at 32). For example, the ALJ noted that Plaintiff had delivered newspapers for a period of time after her alleged onset date. (Doc. 11 at 32). Plaintiff testified that she began working ten hours a week as a newspaper delivery driver in May 2018. (Doc. 11 at 62). In August 2018, Plaintiff told her primary care provider that she was working as a newspaper delivery driver (Doc. 11 at 27, 706) - a job that she had also apparently done prior to her alleged onset date and one that she described as involving delivering 126 newspapers a day, weighing no more than 15 to 20 pounds a load. (Doc. 11 at 27, 533).

Plaintiff also testified that she had begun working 20 to 25 hours a week as a hospitality aide at a rehabilitation and nursing home facility in December 2019, and was still employed there at the time of her administrative hearing. (Doc. 11 at 62, 71). Plaintiff explained that her job as a hospitality aide involves visiting the residents, delivering their food trays and serving them ice, and stocking closets. (Doc. 11 at 63-64). Plaintiff additionally testified that she babysits and cares for her two young grandchildren for approximately six hours a day, four days a week. (Doc. 11 at 70-71, 74). While Plaintiff further testified that she has to lie down and rest after babysitting (Doc. 11 at ), the ALJ reasonably found the fact that she was able to regularly engage in the above activities undermined her testimony that she could not lift anything, frequently dropped small objects, and was in constant pain

that precluded her from standing or walking for more than 30 minutes at a time.
See e.g. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (holding that an ALJ can
consider a claimant's ability to perform daily activities when assessing subjective
symptom testimony).

Second, the ALJ found that Plaintiff's subjective complaints were not
supported by the objective medical evidence, as summarized in her decision. (Doc.
11 at 32-37). For example, the ALJ noted that during a medical appointment on
March 27, 2018, Plaintiff reported feeling global weakness in her bilateral upper
extremities and frequently dropping things. (Doc. 11 at 35, 619). Upon
examination, however, she had full strength in both upper extremities, and full grip
strength. (Doc. 11 at 35, 619). The ALJ permissibly found that such normal
physical findings undercut Plaintiff's testimony that she could not lift anything and
often dropped objects. See *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001)
("While subjective pain testimony cannot be rejected on the sole ground that it is
not fully corroborated by objective medical evidence, the medical evidence is still
a relevant factor in determining the severity of the claimant's pain and its disabling
effects.").

The ALJ also cited evidence of Plaintiff's favorable response to treatment as
a basis for discounting her subjective testimony. For example, the ALJ noted that
on May 31, 208, Plaintiff reported that cervical epidural steroid injections provided

her significant relief for several weeks, and then only a "mild return" of symptoms. (Doc. 11, at 35, 628). The ALJ reasonably found the fact that Plaintiff reported significant improvement with steroid injections was not consistent with her testimony as to the constant severity of her pain. See *Morgan v. Comm. of Soc. Sec. Admin.*, 169 F.3d 595, 599-600 (9th Cir. 1999) (stating that an ALJ may consider medical reports of improvement when evaluating a claimant' credibility).

Finally, the ALJ found that Plaintiff made inconsistent statements about the benefits of antidepressants, which undermined her credibility. (Doc. 11 at 36). Even if this reason was not supported by substantial evidence, the ALJ provided other clear and convincing reasons that are supported by substantial evidence for discounting Plaintiff's testimony. Therefore, the Court upholds the ALJ's adverse credibility determination. See *Carmickle v. Commissioner, Social Sec. Admin.*, 533 F.3d 1155, 1162-63 (9th Cir. 2008) (finding an error by the ALJ with respect to one or more factors in a credibility determination may be harmless if the ALJ's "remaining reasoning and ultimate credibility determination were adequately supported by substantial evidence in the record.").

## B.    Medical Opinion Evidence

Plaintiff next argues the ALJ erred by not giving more weight to the opinion of her primary care provider, physician assistant Rebecca Hintze, PA-C.

For all claims filed after March 27, 2017, the Social Security Administration

has amended the rules regarding the evaluation of medical opinion evidence at the administrative level. See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (Jan. 18, 2017). Because Plaintiff filed her claims for disability benefits in March 2018, the amended regulations apply in this case.

The revised regulations expanded the list of "acceptable medical sources" who can provide objective medical evidence to establish the existence of a medical impairment to include licensed physician assistants. 20 C.F.R. § 404.1502(a), 416.902(a). As a licensed physician assistant, Hintze thus qualifies as an acceptable medical source.

Under the new regulations, the ALJ "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence, 2017 WL 168819, 82 Fed. Reg. 5844, at 5867-68 (Jan. 18, 2017). *See* 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (2017). These regulations do away with the traditional hierarchy between treating, examining, and non-examining physicians, and instead direct the ALJ to consider all medical opinions and prior administrative medical findings, and evaluate their persuasiveness using several listed factors. 20 C.F.R. §§ 404.1520c(a), 416.920(a). Those factors include supportability, consistency, relationship with the claimant, specialization, and "other factors that tend to support or contradict a medical opinion or prior administrative medical

12

finding." 20 C.F.R. §§ 404.1520c(c), 416.920(c). The two most important factors are supportability and consistency. 20 C.F.R. §§ 404.1520c(a), 416.920(a).

The regulations require the ALJ to articulate how persuasive she finds all of the medical opinions and prior administrative medical findings, and set forth specific "articulation requirements" for the ALJ's evaluation of the medical opinion evidence. 20 C.F.R. §§ 404.1520c(b), 416.920(b). When one medical source provides multiple opinions, the ALJ is not required to articulate how she "considered all of the factors for all of the medical opinions" and will instead articulate how she considered those opinions "together in a single analysis using the factors" listed above. 20 C.F.R. §§ 404.1520c(b)(1), 416.920(b)(1). Because supportability and consistency are the most important factors, the ALJ must explain how she considered these factors in the decision. Generally, the ALJ is not required to explain how she considered the remaining factors. 20 C.F.R. §§ 404.1520c(b)(2), 416.920(b)(2). However, when the ALJ finds that two or more medical opinions are equally well-supported and consistent with the record but are not exactly the same, she must articulate how she "considered the other most persuasive factors." 20 C.F.R. §§ 404.1520c(b)(3), 416.920(b)(2).

While the new regulations eliminate the hierarchy between treating, examining, and non-examining medical sources, the ALJ must still provide legally sufficient reasons supported by substantial evidence for finding a medical opinion

unpersuasive. *Beason v. Saul*, 2020 WL 606760, *3 (C.D. Cal. Feb. 7, 2020). The "new regulations still require the ALJ to explain his or her reasoning to specifically address how he or she considered the supportability and consistency of the medical opinion." *Brandee M.*, 2021 WL 2781803, at *3 (citing 20 C.F.R. §§ 404.1520c, 416.920c). Thus, the Court must determine whether the ALJ properly evaluated Hintze's medical opinion using the factors set forth above. See e.g., *Ryan L.F. v. Commissioner of Social Security,* 2019 WL 6468560 *3-4 (D. Or. Dec. 12, 2019).

Hintze has been Plaintiff's primary care provider since November 2016. The majority of Plaintiff's medical records are from Hintze and occasionally other providers at the same health care facility, Community Health Partners. (Doc. 11 at 540-603; 691-704; 705-733; 748-768; 773-790; 794-805). Between December 2017 and May 2018, Plaintiff was also treated by Vanessa Lipp, a physician assistant at Bridger Orthopedic and Sports. (Doc. 11 at 604-637).

On March 20, 2018, Hintze completed a physical assessment form on which she found that Plaintiff had several restrictive functional limitations. (Doc. 11 at 537-38). Hintze found that Plaintiff's symptoms were "constantly" severe enough to interfere with the attention and concentration required to perform simple work-related tasks, and indicated that she would need to recline or lie down during a hypothetical 8-hour workday in excess of the time typically allowed for breaks. Hintze further found that Plaintiff could: walk two to three city blocks on flat

14

ground without rest or significant pain; sit for a total of one hour in an eight-hour workday; stand/walk for a total of one hour in an eight-hour workday; and never be able to lift and carry in a work setting, not even less than 10 pounds. (Doc. 11, at 537). Hintze indicated that Plaintiff could use her right hand to grasp, turn, and twist objects for 5% of the time during an eight-hour workday, and use her left hand for those activities for 10% of the time. (Doc. 11, at 537). Hintze found that Plaintiff could never use either arm for reaching, and could not perform any fine manipulation with either hand. Hintze stated that Plaintiff would need to take unscheduled breaks of 20-30 minutes during every workday, and would likely be absent from work more than four times a month due to her impairments or treatment. (Doc. 11, at 538).

The ALJ considered Hintze's opinion, but found it unpersuasive because the restrictive limitations she identified in her assessment were not supported by the medical evidence, including Hintze's own physical examination findings. (Doc. 11, at 37-38). The ALJ's decision includes a thorough summary of Hintze's physical examination findings and treatment notes. (Doc. 11 at 33-36). As Plaintiff correctly points out, however, that summary is not entirely accurate.

The first portion of the ALJ's summary is problem free. The ALJ noted that when Plaintiff saw Hintze on November 7, 2017, approximately two weeks before her alleged onset date, she reported reaching overhead and feeling a "pop" in her

15

right arm while at work. (Doc. 11 at 567). Hintze's physical examination findings showed slightly decreased right upper extremity grip strength; tenderness to palpation over the ulnar notch; decreased sensation to the right hand and third, fourth, and fifth digits; and decreased range of motion in the neck with palpation tenderness and marked muscle spasm. (Doc. 11 at 34, 568). A follow up MRI of Plaintiff's cervical spine in December 2017 showed no change from an earlier MRI in November 2016, except for progressed spinal canal narrowing at C6-C7. (Doc. 11 at 34, 675-76). In January 2018,[1] Plaintiff reported to Hintze that she was providing home care for an older woman, and was experiencing right arm pain and weakness which made this work difficult for her. (Doc. 11 at 557). Hintze's physical examination findings at that time reflected that Plaintiff had a normal gait and full strength in her upper and lower extremities bilaterally, but some decreased grip strength and elbow range of motion in her right arm. (Doc. 11 at 558).

Plaintiff saw Hintze again on March 9, 2018 (Doc. 11 at 547-50) and March 20, 2018 (Doc. 11 at 543-45). As the ALJ describes it, Plaintiff "reported to Ms. Hintze in early and mid-March that right arm/hand symptoms had worsened to the point she could not hold even a cup of coffee cup. Musculoskeletal and neurologic

---

[1] Although ALJ mistakenly states that this appointment took place on February 24, 2018 (Doc. 11 at 34), this particular misstatement is inconsequential. See *Stout v. Commissioner, Social Sec. Admin.*, 454 F.3d 1050, 1055-56 (9ᵗʰ Cir. 2006) (an ALJ's error is harmless if it is "inconsequential to the ultimate nondisability determination).

findings were significant in early March yet almost completely normal approximately two weeks later." (Doc. 11 at 34). The ALJ accurately summarizes Hintze's physical examination findings from March 9, 2018, which showed marked decrease in range of motion and tenderness to palpation through the cervical spine with evidence of decreased grip strength in her right arm and decreased biceps jerk compared to the left. (Doc. 11 at 35, 549).

The ALJ then states that "[s]ignificant improvement appears to have occurred within only two weeks given subsequent unremarkable examination findings wherein Ms. Hintze described [Plaintiff] as without tenderness, joint swelling, or erythema, and again evidencing only a slightly reduced grip strength with normal ranges of motion at the elbows, wrists, and shoulder." (Doc. 11 at 35). The treatment notes the ALJ cites to support this statement are from Plaintiff's appointment on March 20, 2018 – the day that Hintze filled out the physical assessment form at issue. (Doc. 11 at 543-44). While Hintze's notes from that visit indicate that Plaintiff was in no acute distress and a "visual overview of extremities [was] within normal" with "[n]o joint erythema, swelling, or deformities," there is no mention of grip strength or normal ranges of motion at the elbows, wrists, and shoulder. (Doc. 11 at 543-44). In fact, it was on this visit that Plaintiff told Hintze "she ha[d] not been doing very well this week" and her neck and right hand and

arm were "worsening to the point that she cannot even hold up a coffee cup." (Doc. 11 at 34, 543).

The Court agrees with Plaintiff that the ALJ mischaracterized these treatment notes, which do not support her statement that Hintze's "[m]usculoskeletal and neurologic findings were significant in early March yet almost completely normal approximately two weeks later." (Doc. 11 at 34). Notably, the Commissioner fails to address Plaintiff's argument that the ALJ erred in describing Hintz's March 2018 treatment notes. To the extent the ALJ discounted Hintze's opinion because her physical examination findings reflected "significant improvement" during the month of March, the ALJ's reasoning was erroneous and is not supported by substantial evidence.

While this portion of the ALJ's reasoning was erroneous, the ALJ also discussed other physical examination findings from the same time period that were not consistent with the restrictive limitations identified in Hintze's opinion. Specifically, the ALJ cites medical records from two appointments with physician assistant Lipp in March and May 2018.[2] (Doc. 35, 619, 628). The ALJ noted that at

---

[2] The ALJ mistakenly stated that these were follow up visits with Hintze, when in fact they were appointments with physician assistant Lipp, at Bridger Orthopedic and Sports. (Doc. 11 at 35, 604-637). The ALJ's error in attributing these records to Hintze is inconsequential, however, because regardless of who performed the examinations, the medical findings and observations are accurately described by the ALJ.

the March 27, 2018 appointment, Plaintiff complained of global weakness in her upper extremities and continuing to drop things, but physical examination findings showed she had full muscle strength in both upper extremities, including grip strength. (Doc. 11 at 35, 619). Plaintiff was also described as being in no acute distress, and she ambulated with a non-antalgic gait. (Doc. 11 at 35, 619). The ALJ also noted that after receiving cervical epidural steroid injections in early May 2018, Plaintiff reported at a May 27, 2018 follow up visit that she had experienced significant relief for several weeks. (Doc. 11 at 35, 628). Plaintiff denied have any pain, numbness, or weakness in upper extremities at that time, and she presented in no acute distress, with a normal gait. (Doc. 11 at 35, 628).

The ALJ reasonably found that the medical observations and physical examination findings in the records discussed above did not support the standing, walking, and upper extremity limitations set forth in Hintze's opinion. (Doc. 11 at 38). As the ALJ noted, for example, medical records reflecting that Hintze had a normal gait were not consistent with Hintze's opinion that Plaintiff could not stand or walk for more than one hour in an eight-hour workday. Likewise, physical examination findings that Plaintiff had full strength in her upper extremities and only slightly diminished grip strength were not consistent with Hintze's opinion that Plaintiff would never be able lift and carry anything in a work setting, and could never use either arm for reaching. Notwithstanding the inaccuracies noted

above, which amounted to harmless error, the ALJ reasonably found that Hintze's opinion was not persuasive because it was not supported by the medical evidence, including Hintze's own physical examination findings.

The ALJ also found Hintze's opinion unpersuasive because it was not consistent with Plaintiff's acknowledged daily activities. (Doc. 11 at 38). As discussed above, the record reflects that in May 2018, Plaintiff began working ten hours a week as a newspaper delivery driver. (Doc. 11 at 62).  Plaintiff had apparently done the same work prior to her alleged onset date, and described the job to a consultative examining physician in September 2017 as one that required her to deliver more than 100 newspapers a day, weight up to 20 pounds a load. (Doc. 11 at 533). The ALJ found it significant that when Hintze filled out the physical assessment form on March 20, 2018, she knew of Plaintiff's "ongoing daily activities and work activity, including [Plaintiff's] subsequent newspaper delivery activity requiring lifting and carrying far beyond the lifting, carrying, gripping, manipulative, and other limitations" in Hintze's opinion. (Doc. 11 at 38). Contrary to the ALJ's statement, it is not clear that Hintze knew when she filled out the physical assessment form in March 2018 that Plaintiff was doing part-time newspaper delivery work. In fact, the record reflects that Plaintiff did not begin delivering newspapers again until May 2018 (Doc. 11 at 62), and first reported this activity to Hintze during an appointment in August 2018. (Doc. 11 at 706).

Notwithstanding these discrepancies, the ALJ legitimately found that Hintze's assessment of Plaintiff's lifting, carrying, and gripping limitations was not consistent with Plaintiff's newspaper delivery work, which resumed in May 2018 – just two months after Hintze's March 2018 opinion. In addition, it was reasonable for the ALJ to reject the functional limitations identified by Hintze in light of Plaintiff's subsequent work as a hospitality aide, which involved such tasks as delivering food trays to nursing home residents, serving them ice, and stocking closets. (Doc. 11 at 63-64). Furthermore, as discussed above, Plaintiff testified that she babysits and cares for her two young grandchildren for approximately six hours a day, four days a week. (Doc. 11 at 70-71, 74). The ALJ reasonably found that these activities were not consistent with the standing, walking, lifting, and carrying limitations identified in Hintze's physical assessment.

In sum, the Court finds that, notwithstanding the inconsequential errors identified above, the ALJ adequately articulated how she considered supportability and consistency as factors in rejecting Hintze's opinion, and those reasons are legally sufficient and supported by substantial evidence.

## IV.   **Conclusion**

For the reasons discussed above, the Court concludes the ALJ's decision is

//

//

based on substantial evidence and free of harmful legal error. Accordingly,

IT IS ORDERED that the Commissioner's decision is AFFIRMED.

DATED this 8th day of March, 2022.

_____
Kathleen L. DeSoto
United States Magistrate Judge